<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

——————————————————————————— |

IN RE:  MERCK & CO., INC. | 
DERIVATIVE & "ERISA" LITIGATION |

| 

CONSOLIDATED DERIVATIVE ACTION |

|

——————————————————————————— |

Hon. Stanley R. Chesler, U.S.D.J.
MDL No.  1658 (SRC)

Civil Action No.  05-1151
Civil Action No.  05-2368

**OPINION**

**CHESLER**, District Judge

      **THIS MATTER** comes before the court upon the motion of Defendants H. Brewster

Atwater, Jr., Derek Birkin, Lawrence A. Bossidy, William G. Bowen, Erskine B. Bowles,

Johnnetta B. Cole, William M. Daley, Lloyd C. Elam, Charles E. Exley, Jr., Niall FitzGerald,

Kenneth C. Frazier, Raymond V. Gilmartin, William B. Harrison, Jr., Richard C. Henriques, Jr.,

William N. Kelley, Shelly Lazarus, Judy C. Lewent, Mary M. McDonald, Heidi G. Miller,

Edward M. Scolnick, Thomas E. Shenk, Anne M. Tatlock, Samuel O. Thier, Dennis

Weatherstone, Wendell P. Weeks, Peter C. Wendell, and nominal defendant Merck & Co., Inc.

("Merck") (collectively "Defendants"), to dismiss the Verified Consolidated Shareholders'

Derivative Complaint ("Complaint") pursuant to Federal Rules of Civil Procedure 12(b)(6) and

23.1.  For the reasons set forth below, this Court will **GRANT** Defendants' motion.

## I.  BACKGROUND

      This shareholder derivative action arises from Merck's development and sale of the

prescription pain medication Vioxx.   Considering Defendants' motion to dismiss, the Court is

limited to examining the allegations set forth in the Complaint providing Plaintiffs with the benefit of all reasonable factual inferences that the allegations support.  F.G. v. MacDonell, 150 N.J. 550, 556 (1997).   Therefore, the Court sets forth the following summary of Plaintiffs' allegations, most of which are disputed by Defendants.

Merck is a global pharmaceutical company incorporated in New Jersey, which researches, develops, manufacturers and markets a broad range of medicines and vaccines that improve human and animal health.  See Verified Shareholder Complaint at ¶¶ 8, 47 ("Compl. ¶ __").  Plaintiffs are shareholders bringing this action on behalf of Merck against all individuals who were serving on Merck's Board of Directors as of March 11, 2004 – the date the first shareholder derivative action relating to Vioxx was filed –  as well as thirteen other current or former directors and officers of the company.

Vioxx is a member of a class of pain medications known as non-steroidal anti-inflammatory drugs ("NSAIDs").  Vioxx is one of a new generation of "selective" NSAIDs called COX-2 inhibitors, which are designed to reduce inflammation and pain while avoiding the risk of serious gastrointestinal side effects associated with traditional NSAIDs.  (Compl. ¶¶ 12, 85.)   After receiving approval from the Food and Drug Administration ("FDA"), Vioxx was introduced to the market in May 1999.  (Compl. ¶ 16.)  Vioxx was marketed and sold for over five years until September 30, 2004, when Merck voluntarily withdrew the medication.  (Id. ¶ 29.)

Plaintiffs contend that scientists within Merck were aware that Vioxx may cause cardiovascular problems for its users as early as 1996.  (Compl. ¶ 13.)  Plaintiffs allege that, from approximately 1996 to 2004, Merck made public statements which promoted the use of Vioxx

for treatment of arthritis, and for other pain sufferers.  (Compl. ¶ 89.)   None of these statements, however, mentioned any cardiovascular risks associated with the use of Vioxx, despite Defendants' alleged knowledge of this problem.  Plaintiffs contend that Defendants continued to have the Company conceal Vioxx's health risks and repeatedly emphasized safety despite scientific data to the contrary.  (Compl. ¶ 16.)

In 1999, Merck initiated an 8,000-person Vioxx Gastrointestinal Outcomes Reasearch ("VIGOR") trial designed to prove the drug's gastrointestinal safety benefits.  (Id.)  The trial compared people taking a high dose of Vioxx with those taking naproxen, and excluded those at a high risk of heart problems.  The results of the VIGOR study came in on March 9, 2000.  The results showed that Vioxx patients suffered fewer stomach problems than the naproxen group, but significantly more blood-clot related problems.  (Id. ¶ 17.)  These results were published in the *New England Journal of Medicine* in November of 2000.  (Id.)  Although the article discussed Vioxx's benefits for the stomach, it did not discuss in any detail information about potential cardiovascular complications.  (Id.)

On February 8, 2001, Merck executives met with the FDA Arthritis Advisory Committee to discuss Vioxx and the VIGOR trial.  During the meeting, approximately seven doctors discussed cardiovascular complications associated with Vioxx. (Id.)  Plaintiffs maintain that Defendants, nonetheless, caused Merck to issue a press release on May 22, 2001 in which the Company "reconfirmed the favorable cardiovascular safety profile of Vioxx."  (Id. ¶ 20.)

On August 22, 2001, researchers at the Cleveland Clinic published a study in the *Journal of the American Medical Association* ("JAMA") which discussed the VIGOR study and Celecoxib Long-term Arthritis Safety Study ("CLASS") studies.  (Id. ¶ 21.)  The article stated

3

that "[t]he annualized myocardial infarction rates for COX-2 inhibitors in both VIGOR and

CLASS were significantly higher than that in the placebo group. . . .   The available data raise a

cautionary flag about the risk of cardiovascular events with COX-2 inhibitors."  (Id.)  Plaintiffs

allege that prior to the publication of the article, Defendants caused Merck to publicly claim that

"VIOXX does not result in any increase in cardiovascular events compared to placebo," and that

it had "additional data beyond what [the Cleveland Clinic] cite[s], and the findings are very, very

reassuring."  (Id.)   On September 17, 2001, the FDA sent Defendant Gilmartin a warning letter

stating that Merck's promotional campaign "minimizes the potentially serious cardiovascular

findings that were observed in the [VIGOR] study, and thus, misrepresents the safety profile for

Vioxx."  (Id. ¶ 22.)

In May 2004, Harvard researchers published the results of a Merck-sponsored study

which "found Vioxx was associated with an elevated risk of heart attacks (39% higher),

compared to the use of Celebrex or a placebo."  (Compl. ¶ 23.)  Plaintiff alleges that Defendants

"demanded that researchers delete or tone down their findings," and that prior to publication of

the results, Defendants removed the name of a Merck employee who had worked on the study

from the list of authors.  (Id.)

On August 25, 2004, Dr. David Graham, an FDA researcher, presented the results of an

FDA study at a medical conference.  (Id. ¶ 24.)  The results showed that higher doses of Vioxx

"may have led to more than 27,000 heart attacks and sudden cardiac deaths" and triple the risk of

heart attacks and death.  (Id.)  Plaintiffs contend that the following day, Defendants caused

Merck to state publicly that they "strongly disagree[d] with Graham's conclusion, and that

'Merck stands behind the efficacy, overall safety and cardiovascular safety of Vioxx.'" (Id.)

Plaintiffs further allege that Defendants threatened and intimidated numerous academics who publicly questioned or discussed the safety of Vioxx.  (Compl. ¶¶ 26-28.)  Plaintiffs maintain that certain Merck directors held the power to withdraw important funding from academic research and also cancelled the presentations of doctors who questioned the safety of Vioxx.  (Id.)

The first shareholder derivative actions relating to Vioxx were filed in March 2004 in the United States District Court for the Eastern District of Louisiana. *Staehr v. Gilmartin*, No. 04-0721 (E.D. La., filed Mar. 11, 2004).  By an order dated February 23, 2005, the Judicial Panel on Multidistrict Litigation transferred all VIOXX-related derivative actions pending in federal courts, along with all VIOXX-related securities and ERISA actions, to this Court for pre-trial consolidation or coordination.  On May 6, 2005, this Court consolidated all the federal shareholder derivative actions for all purposes.  On June 20, 2005, the Derivative Plaintiffs filed the Complaint in this matter asserting seven claims: (1) Intentional Breach of Fiduciary Duty, (2) Gross Breach of Fiduciary Duty; (3) Unjust Enrichment; (4) Gross Mismanagement; (5) Corporate Waste; (6) Misappropriation of Corporate Information; and (7) Contribution and Indemnification.  (Compl. ¶¶ 219-248.)  On or about August 26, 2005, Defendants filed the instant Motion to Dismiss[1] (docket entry # 10.)  This Court held oral argument on April 5, 2006.

---

[1]On November 10, 2005, Plaintiffs filed a redacted version of their memorandum in opposition to Defendants' Motion to Dismiss.  Thereafter, Plaintiffs filed an unredacted version of their opposition under seal.  Contained in Plaintiffs' unredacted brief were arguments and factual assertions relying on after-acquired information Plaintiffs obtained during the course of discovery.  On December 22, 2005, Defendants filed a Motion to Strike the extraneous documents in Plaintiffs' opposition.  At oral argument on April 5, 2006, this Court granted Defendants' Motion to Strike because the information in Plaintiffs unredacted brief was not contained in the Complaint and did not constitute the type of material that can be considered on a motion to dismiss pursuant to Rule 12(b)(6).

## II.  DISCUSSION

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must take as true all allegations in the complaint and view them in the light most favorable to the plaintiff. Gomez v. Toledo, 446 U.S. 635, 636 n.3 (1980); Trump Hotels & Casino Resorts, Inc. V. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998).  Pursuant to Rule 12(b)(6), a complaint shall be dismissed for failure to state a claim upon which relief can be granted only if a court finds "it apparent beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 46 (1957).  The question the court must answer is not whether Plaintiff will prevail, but rather whether there are any circumstances that would entitled him to relief.  Hishon v. Spalding, 467 U.S. 69, 73 (1984).

Defendants contend that the Complaint must be dismissed because Plaintiffs have not pled demand futility with the particularity required by Federal Rule of Civil Procedure 23.1, which provides, in pertinent part, that:

> In a derivative action brought by one or more shareholders or members to enforce a right of a corporation . . . the complaint shall [] allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority . . . and the reasons for the plaintiff's failure to obtain the action or for not making the effort.

Plaintiffs concede that they did not make demand on the Merck Board.  (Compl. ¶ 218(i).)  They argue in opposition to Defendants' motion to dismiss that their failure to make a pre-suit demand upon the Board is excused as futile.

A.    **Demand Requirement**

It is hornbook law that a shareholder derivative action is one in which a shareholder asserts a claim belonging to the corporation and on the corporation's behalf.  See generally Deborah A. DeMott, Shareholder Derivative Actions § 1:1 (2003); In re Prudential Ins. Co. Derivative Litig., 282 N.J. Super. 256, 274 (App. Div. 1995) ("Prudential").  A shareholder derivative action stands in contrast to the fundamental principle of corporate governance that "[t]he decision to bring a lawsuit or to refrain from litigating a claim on behalf of the corporation is a decision concerning the management of the corporation and consequently is the responsibility of the directors."  Blasband v. Rales, 971 F.2d 1034, 1048 (3d Cir. 1992) (citing Levine v. Smith, 591 A.2d 194, 200 (Del. 1991)).  In light of how shareholder derivative actions may usurp director control, courts have warned of the pitfalls of unchecked shareholder derivative litigation.  "[A]lthough [shareholder derivative] litigation may compensate the corporation for injuries sustained as a result of wrongful conduct, it also may have a negative effect on corporate governance when frivolous lawsuits initiated by opportunistic shareholders are brought . . . [and] [i]f abused . . . can impede the best interests of the corporation."  In re PSE&G Shareholder Litig., 173 N.J. 258, 278 (2002) (citing Bradley T. Ferrell, Note, *A Hybrid Approach: Integrating the Delaware and ALI Approach to Shareholder Derivative Litigation*, 60 OHIO ST. L.J. 241, 241-43 (1999) ("PSE&G").

To curb concerns over excessive shareholder derivative litigation, most jurisdictions require shareholders to make a demand upon the corporation's board of directors prior to instituting a derivative action.  Carol B. Swaanson, *Juggling Shareholder Rights and Strike Suits in Derivative Litigation: The ALI Drops the Ball*, 77 MINN. L.REV. 1339, 1341 (1993).

Accordingly, most jurisdictions will  prohibit shareholders from initiating such actions unless they can demonstrate that (1) "the corporation itself has refused to proceed after suitable demand," or that (2) demand should be "excused by extraordinary conditions."  See In re Cendant Corp. Derivative Litig., 189 F.R.D. 117, 127 (D.N.J. 1999) (quoting Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 96 (1991)).  Similarly, Federal Rule of Civil Procedure 23.1 establishes threshold pleading requirements with respect to shareholder derivative litigation. Although Rule 23.1 "speaks only to the adequacy of the shareholder representative's pleadings," Kamen, 500 U.S. at 96, the "substantive requirements of demand" are determined by state law. Blasband, 971 F.2d at 1047 (citing Kamen, 500 U.S. at 96-97).[2]

Similarly, New Jersey Court Rule 4:32-5 provides that all shareholder derivative complaints shall "set forth with particularity the efforts of the plaintiff to secure from the managing directors or trustees, and, if necessary, from the shareholders such action as is desired, and the reasons for the failure to obtain such action or the reasons for not making such effort." Accordingly, New Jersey law provides that a plaintiff must make a demand pursuant to Court Rule 4:32-5 unless he or she is excused from so doing by law.  See In re Midlantic Corp. Shareholder Litig., 758 F. Supp. 226, 239 (D.N.J. 1990).  As discussed more fully below, in circumstances where, as here, a plaintiff admits to not having made a prior demand on the board, that plaintiff must demonstrate that such a demand would be futile.

**B.    Merck's Formation of a Special Board Committee Does Not Waive Demand**

Plaintiffs contend this Court need not reach the pleading issues in Defendants' motion

---

[2]As noted, Merck is a New Jersey corporation.  Accordingly, New Jersey law will govern the substantive aspects of Plaintiffs' claims, including whether Plaintiffs satisfied New Jersey's demand requirement with respect to Merck.

because the decision of Merck's Board to create a special committee effectively concedes that

pre-suit demand is not required.  (Pl. Br. 12.)  In support of their contention, Plaintiffs rely on

Abbey v. Computer & Commc'ns Tech. Corp., 457 A.2d 368 (Del. Ch. 1983).  In response

Defendants argue that Plaintiffs have mischaracterized the holding of Abbey and that Delaware

courts have rejected a reading of Abbey making the creation of a special litigation committee an

automatic waiver of an argument that demand would not be futile.  (Def. Rep. Br. 11-12.)

On December 7, 2004, Merck announced the appointment of a Special Board Committee

to review the company's actions prior to the withdrawal of Vioxx.  (Greenwald Decl., Ex. 5.)

The Special Board Committee was appointed to "act for the Board in responding to shareholder

litigation matters related to the withdrawal of Vioxx and to advise the Board with respect to any

action that should be taken as a result of the review."  (Id.)  The Special Committee is chaired by

Defendant Bowen.   Other members of the March 2004 Board who serve on the Committee are

Defendants Bossidy, Kelley, Thier, and Wendell.  (Id.)   The Special Committee also obtained

outside counsel to assist with the independent review.  (Id.)

Plaintiffs rely heavily on Abbey for the proposition that where a self-interested board of

directors delegates the decision whether to pursue the company's claims to a special committee

prior to moving to dismiss a derivative complaint, the board has conceded that pre-suit demand is

not required.  (Pl. Br. 12.)  The plaintiff in Abbey brought a shareholder derivative action

alleging that a majority of the board improperly benefitted from issuing false statements.  In

Abbey, unlike here, the plaintiff made a demand upon CCTC's board of directors prior to

instituting the derivative action.  457 A.2d at 369.  In response to plaintiff's demand, CCTC

stated, in a letter dated the following day, that a review was underway and they would be in

contact with plaintiff after the return of their general counsel from vacation.  Id.   A few weeks

after receiving the letter, plaintiff still had not heard from the board and decided to file a

complaint.  Id.

In response to the filing of plaintiff's lawsuit, the CCTC board convened a special

meeting to determine what action should be taken.  At this meeting, the board determined it

would be in the best interests of the company to appoint a committee comprised of an

independent director to investigate the demand and "determine whether the corporation should

bring an action against said [individual defendants.]"  Id. at 371.   A director with no previous

affiliation with CCTC was added to the board and was then appointed as director of the

committee.  Id.   After the committee retained independent counsel, the corporation filed a

motion to dismiss plaintiff's complaint for failure to comply with Rule 23.1.  The Abbey court

held the board had conceded that a majority of the board had a disqualifying self interest and

therefore, demand was not required:

> [B]y divesting itself of any power to make a decision on the pending suit, and by
> adding a new and independent director and by designating him as a special Litigation
> Committee of one with the final and absolute authority to make the decision on
> behalf of the corporation, the incumbent board of directors, in effect, conceded that
> the circumstances alleged in the complaint justified the initiation of the suit by the
> plaintiff.

Id. at 373.  Here, Plaintiffs contend that Merck's Board similarly delegated authority regarding

the present suit to a Special Committee before moving to dismiss this action and, therefore, have

effectively conceded that the Board was not disinterested.  (Pl. Br. 13.)

The Court is unpersuaded by Plaintiffs broad interpretation of Abbey.  The holding in

Abbey was based upon the fact that the CCTC board vested full decision making authority

10

regarding plaintiffs suit with the committee, including the authority to move for dismissal under the procedures set forth in Zapata Corp. v. Maldonado, 430 A.2d 779 (Del. 1981).  In fact, the Abbey court specifically distinguished a situation where a board of directors "merely appointed a committee to investigate the allegations and to report back to the board for whatever action the board might choose to take on the merits of the charges."  457 A.2d at 374.

Moreover, Delaware courts have explicitly rejected arguments that Abbey stands for the broad proposition that the mere establishment of a special committee is a concession that pre-suit demand is not required.  See Spiegel v. Buntrock, 571 A.2d 767, 777 (Del. 1990) (rejecting the proposition that a "board of directors, *ipso facto*, waives its right to challenge a shareholder plaintiff's allegation that demand is excused by the act of appointing a special litigation committee and delegating to [it] the authority to act on the demand"); Seminaris v. Landa, 662 A.2d 1350, 1352-53 (Del. Ch. 1995) (same).   Demonstrating that a board of directors conceded demand futility requires a plaintiff to show that the board is "both interested *and* established a special litigation committee to resolve the derivative plaintiff's suit."  Levine v. Smith, 591 A.2d 194, 209 (Del. 1991) (citing Spiegel, 571 A.2d at 777) (emphasis added); see also Seminaris, 662 A.2d at 1353.   Accordingly, to find that a board of directors conceded the futility of demand requires a derivative plaintiff to "allege particularized facts to support a factual determination that the board intended to concede demand."  Seminaris, 662 A.2d at 1353.

The facts presently before this Court do not support an inference that the Merck Board conceded demand futility by appointing a Special Committee.  The Complaint contains no mention of the Special Committee.  The argument presented in Plaintiffs' brief states only that Merck's Board "delegated authority regarding this suit to a Special Committee before moving to

dismiss this action." (Pl. Br. 13.) Based on this singular fact, Plaintiffs conclude that Merck's directors conceded that the Board was not disinterested and that, therefore, demand would have been futile. (Id.) Plaintiffs assert no other facts "to demonstrate that the board considered itself incapable of considering plaintiff[s'] demand." Seminaris, 662 A.2d at 1353. In Abbey, the board reacted to plaintiffs derivative suit by hiring a new, unaffiliated outside director and by designating him as a one-man committee. 457 A.2d at 373. Here, by contrast, Merck's Special Committee is comprised of 6 of the 12 *existing* outside directors. Entrusting the task of reviewing Merck's actions relating to Vioxx to existing directors implies that the directors were considered disinterested and independent. Plaintiffs have failed to demonstrate that the board conceded demand futility; therefore, Plaintiffs must demonstrate that demand was excused.

## C.     Demand Futility

In finding that New Jersey courts look to Delaware law for evaluating claims of demand futility, this Court will do the same. See Prudential, 173 N.J. 258. New Jersey has adopted the standard for demand futility as set forth by the Delaware Supreme Court in Aronson v. Lewis, 473 A.2d 805, 814 (Del. 1984). See PSE&G, 173 N.J. at 282. The New Jersey Supreme Court articulated the Aronson test stating that:

> for shareholder plaintiffs in New Jersey to withstand a motion to dismiss for failure
> to make a demand, they must plead with particularity facts creating a reasonable
> doubt that: (1) the directors are disinterested and independent, or (2) the challenged
> transaction was otherwise the product of a valid exercise of business judgment.

Id.

Under Aronson, the ultimate inquiry is whether the Board's decision was supported by a valid exercise of business judgment. Aronson, 473 A.2d at 812 ("the entire question of demand futility is inextricably bound to issues of business judgment"). Both prongs work in tandem to

12

aid in that analysis.  Under the first prong, a court will scrutinize whether the board was sufficiently independent and disinterested to objectively consider a pre-suit demand.  Where a board satisfies the first prong of Aronson and is presumptively independent and disinterested, the second prong will allow the court to address concerns regarding the inherent "structural bias" of corporate boards asked, in essence, to sue themselves.  Id. at 815 n.8.  The second prong, therefore, will allow a derivative complaint meeting the heightened pleading standard to go forward in circumstances in which "the threat of liability to the directors required to act on the demand is sufficiently substantial to cast a reasonable doubt over their impartiality."  Guttman v. Huang, 823 A.2d 492, 500 (Del. Ch. 2003).

However, "[t]he essential predicate for the Aronson test is the fact that a *decision* of the board of directors is being challenged in the derivative suit."  Rales v. Blasband, 634 A.2d 927, 933 (Del. 1993) (emphasis in original).   Where, as here, a shareholder complaint focuses on alleged inaction by the board, the second prong of the Aronson test is inapplicable.  Aronson, 473 A.2d at 813 ("Technically speaking, [the second prong] has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act."); see also Prudential, 282 N.J. Super. at 283 (citing Rales, 634 A.2d at 933); PSE&G, 173 N.J. at 282; Fagin v. Gilmartin, 432 F.3d 276 (3d Cir. 2005).  In such situations,  "plaintiffs can demonstrate demand futility only by pleading with particularity facts creating a reasonable doubt that a majority of the board is not independent and disinterested."  Rales, 634 A.2d at 934.

Although the analysis under Rales requires only a singular inquiry, it nonetheless embodies the concerns relevant to both the first and second prongs of Aronson.  For example, where a complaint alleges self dealing by three members of a seven member board, the Rales

inquiry, like the first prong of <u>Aronson</u>, will focus on whether the remaining four directors would be able to act independently of the three interested directors.   However, when a complaint alleges wrongful conduct by a majority of the board the court must address the same concerns considered by the second prong of <u>Aronson</u>.  Accordingly, if the directors will face a substantial likelihood of personal liability, their ability to impartially consider a demand under <u>Rales</u> would be compromised.  It is against this procedural and substantive framework that the Court will address the parties' arguments.

1.    <u>Merck's Board of Directors as Comprised on March 11, 2004</u>

As of March 11, 2004 – the date the first shareholder derivative action relating to Vioxx was filed – the following thirteen individuals served on Merck's Board of Directors:  Raymond D. Gilmartin ("Gilmartin"), Lawrence A. Bossidy ("Bossidy"), William G. Bowen ("Bowen"), Johnnetta B. Cole ("Cole"), William M. Daley ("Daley"), William B. Harrison, Jr. ("Harrison"), William N. Kelley ("Kelley"), Heidi G. Miller ("Miller"), Thomas E. Shenk ("Shenk"), Anne M. Tatlock ("Tatlock"), Samuel O. Thier ("Thier"), Wendell P. Weeks ("Weeks"), and Peter C. Wendell ("Wendell").   With the exception of Defendant Gilmartin, then-President and CEO of Merck, none of the remaining March 2004 Directors were employed by Merck other than as an outside director.  (Compl. ¶ 48-61.)

2.    <u>Plaintiffs' Complaint Does Not Establish Demand Futility</u>

Plaintiffs allege that demand is excused because: (1) the March 2004 Board of Directors actively participated in and approved of Merck's strategic plans to market and sell Vioxx; (2) three members of the Board sold stock based on material non-public information; (3) the directors faced personal liability and would be unwilling to institute litigation against themselves;

(4) the existence of an "insured v. insured" exclusion in Merck's insurance policy creates a disincentive for Merck's directors to cause the company to sue them; (5) the directors "personally benefited from the unlawful transactions and events alleged in the Complaint" through "excessive" compensation; and (6) the directors had disabling personal and business relationships with each other, and with Merck's top officers.  (Compl. ¶ 218.)   The Court will address each argument in turn.

      **a.**    **Director Interest**

Under a <u>Rales</u> analysis, Plaintiffs' Complaint must demonstrate that seven out of the thirteen March 2004 Directors were incapable of impartially considering a demand made upon the Board.  A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the corporation.  <u>Aronson</u>, 473 A.2d at 812; <u>Rales</u>, 634 A.2d at 936.  "Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders."  <u>Rales</u>, 634 A.2d at 936.

To meet this burden Plaintiffs contend that their failure to make a pre-suit demand should be excused because the individual Defendants face a substantial likelihood of personal liability.  Generally, a threat of personal liability to a director is insufficient to create a disabling interest for a director considering a pre-suit demand.  <u>See Aronson</u>, 473 A.2d at 815.  A substantial likelihood of personal liability, however, would prevent a director from impartially considering a demand.  <u>Id.</u>; <u>see Rales</u>, 634 A.3d at 936.

Here, Plaintiffs contend that such liability would arise because Defendants:  (1) "actively participated in Merck's strategic decision to market and sell Vioxx despite the growing body of

scientific data showing the cardiovascular risks posed by Vioxx use;" (2) received personal benefit from the "Vioxx scheme" by "raking in millions of dollars in salary, bonuses, fees and insider trading proceeds;" (3) "wasted Merck's assets by authorizing lavish stock option grants to themselves and defendants Gilmartin, Lewent and Scolnick as bonuses and rewards for aggressively promoting Vioxx," despite possessing information regarding serious health risks; and (4) extensive interpersonal relationships amongst each other and other top Merck officials precluded Defendants ability to be independent. (Compl. ¶¶ 186 - 205.)

### 1. Directors' Profiting from Alleged Wrongful Conduct

Plaintiffs allege that the substantial financial gain Defendants received as a result of the sale and success of Vioxx makes them interested and, therefore, excuses demand. (Compl. ¶ 201.) Plaintiffs contend that the March 2004 Directors have disabling interests because: (1) the directors received compensation and stock options during the period that Vioxx was on the market, and (2) because three of the March 2004 Directors, Cole, Gilmartin, and Kelley, sold Merck stock while allegedly in possession of non-public information about Vioxx. (Compl. ¶¶ 148, 201-04.)

According to Plaintiffs, Defendants received millions of dollars in salary, bonuses, and fees as a result of their alleged misconduct. (Compl. ¶ 200-01.) The March 2004 Directors allegedly authorized stock option grants to themselves and Defendants Gilmartin, Lewent and Scolnick "as bonuses and rewards for aggressively promoting Vioxx." (Id. ¶ 202.) Plaintiff submits that the stock option awards "were purportedly justified based on Merck's performance under defendants' stewardship." (Id. ¶ 203.) It is because of these "excessive and wholly unjustified stock option awards," that Plaintiffs contend the March 2004 Directors were

interested directors and, therefore, disabled from objectively considering any pre-suit demand. (Id. ¶ 204.)

Courts, however, have found that directors are self-interested only where the director receives a "personal financial benefit from [the transaction] in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all shareholders generally." Aronson, 473 A.2d at 812.   In other words, "[a] director is considered interested where he or she will receive a personal benefit from a transaction or that is not equally shared by the stockholders.  Rales, 634 A.2d at 936; Pogostin, 480 A.2d 619,  624 (Del. 1984) (same) (citation omitted).  It follows, therefore, that "receipt of a bonus, the size of which is tied to the overall profitability of the corporation does not substantiate a claim of self-dealing absent a specific allegation that the voting of the bonuses themselves or the calculation thereof, involved some form of self-dealing."  In re E.F. Hutton Banking Practices Litig., 634 F. Supp. 265, 271 (S.D.N.Y. 1986).

The allegations set forth in the Complaint regarding Defendants compensation and bonus structure are conclusory at best.  The Plaintiffs have done no more than make blanket assertions that the bonuses and stock options Defendants received were "excessive," and "wholly unjustified."  (Compl. ¶¶ 202, 204.)   The Complaint lacks particularized facts demonstrating that the amount received by the March 2004 Directors "exceed[ed] materially what is commonly understood and accepted to be a usual and customary director's fee."  Orman v. Cullman, 794 A.2d 5, 29 n.62 (Del. Ch. 2002).   Further, the Complaint is without any particularized facts that would raise a doubt regarding any self-interest.  Fatal to plaintiffs' contention is the Complaint's failure to explain how the bonus and stock options offered were not otherwise part of a "benefit

17

which devolve[d] upon the corporation to all stockholders generally." <u>Aronson</u>, 473 A.2d at 812.

Accordingly, because the Plaintiffs have not demonstrated that the bonus and stock option

compensation derived from anything other than Merck's overall profitability, Plaintiffs' claim

that demand is futile on this ground must be denied.

Plaintiffs also allege that the March 2004 Directors have disabling interests because three

of the March 2004 Directors[3] sold Merck stock while allegedly in possession of material non-

public information about Vioxx thereby subjecting them to a substantial likelihood of personal

liability.  (Compl. ¶¶ 200, 218(b).)   The Complaint details the challenged stock sales as:

| DEFENDANT | DATES | SHARES | PRICES | PROCEEDS |
|---|---|---|---|---|
| Gilmartin | 2/2/04 | 664,925 | $47.90 | $31,624,500 |
| Cole | 10/31/01 - 4/29/04 | 4,132 | $69.43-$47.20 | $230,661 |
| Kelley | 2/12/03 - 2/6/04 | 3,875 | $53.77 - $48.95 | $171,303 |

(Compl. ¶ 148.)   Plaintiffs contend that these sales occurred while Defendants Gilmartin, Cole,

and Kelley were "in possession of Merck's confidential and proprietary information showing

cardiovascular risk[s] posed by Vioxx use."  (<u>Id.</u> ¶ 218(b).)

Although the proceeds Defendants received from these stock sales seem substantial, the

allegations in the Complaint are insufficient to create an inference of insider trading.  Plaintiffs

do not provide particularized facts as to what percentage of each Defendants overall stock

ownership the sales represent.   Likewise, the Complaint fails to specify the directors previous

trading practices or whether Merck imposed restrictions on the timing of director trading.

---

[3]Plaintiffs' Complaint contains allegations of improper trading by five additional
Defendants.  (Compl. ¶ 148.)  These allegations, however, are not relevant to the Court's analysis
of demand futility because those Defendants were not on the March 2004 Board.

Plaintiffs have failed to allege any particularized facts tying even a single stock sale to specific adverse non-public information in the possession of these directors. See Guttman, 823 A.2d at 505 (holding that plaintiffs must show that "each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information" in order to demonstrate that a director is not disinterested). In fact, as to Defendants Cole and Kelley, Plaintiffs do not even identify specific dates on which they sold stock. Plaintiffs' allegations of insider trading are insufficient to show that a majority of the March 2004 Board was interested. Moreover, the Complaint contains no allegations demonstrating how the stock sales of three members of a thirteen director board rendered the majority of the Board incapable of exercising independent business judgment.

### 3. "Insured v Insured" Exclusion

Plaintiffs also attempt to establish a substantial likelihood of personal liability against the Director Defendants by alleging the existence of a "insured versus insured" exclusion in the directors' and officers' ("D&O") liability insurance policy. (Compl. ¶ 218(g).) Plaintiffs contend that although the D&O policy protects Defendants against personal liability for breaches of their fiduciary duties, the policy eliminates coverage for any action brought directly by Merck against these Defendants. (Id.) As such, Plaintiffs argue this exclusion from coverage demonstrates another reason why Defendants would not bring this suit. (Id.)

This argument has been explicitly rejected by New Jersey Courts, which have held that "[p]leading that the board would be swayed by the existence of the afore-mentioned policies [containing insured-versus-insured exclusion] is insufficient" to demonstrate director interest. Prudential, 282 N.J. Super. at 280. Following Delaware law, New Jersey Courts have recognized

that "insured v. insured" provisions are standard in D&O policies and therefore, "routine excuse of demand based on the existence of such standard exclusions would eviscerate the demand requirement."  Id.; see Caruana v. Salignman, 1990 WL 212304, at *4 (Del. Ch. Dec. 21, 1990). Accordingly, this Court finds that the allegation of an "insured v. insured" exclusion in Defendants D&O insurance policy insufficient to create an inference of director interest in the March 2004 Board.

4.    *Directors' Participation in Alleged Wrongful Conduct and Exposure to Personal Liability*

Plaintiffs allege that making demand upon the March 2004 Board would be futile because the Director Defendants "authorized, approved, or consciously failed to prevent . . . the Vioxx marketing strategy employed by Merck, and the false statements arising therefrom."  (Compl. ¶ 218(d).)  Further, Plaintiffs contend that Director Defendants "approved, continued to approve and monitor strategic marketing plans and funding authorizations designed to promote Vioxx to the widest possible market," despite allegedly being in possession of scientific evidence questioning the cardiovascular safety of Vioxx.  (Compl. ¶ 218(e).)  Plaintiffs argue that this alleged participation by the Director Defendants exposes them to significant personal liability which precludes them from acting disinterestedly in determining whether to prosecute these claims.  (Id.)

Allegations that a majority of directors participated, approved or acquiesced in a challenged transaction will not, in and of itself,  establish demand futility.  Aronson, 473 A.2d at 817.  Likewise, claims of demand futility based upon allegations that the directors would be required to sue themselves have been similarly rejected.  See Aronson, 473 A.2d at 818;

Pogostin, 480 A.2d at 625; Brehm, 746 A.3d at 257 n.34 ("It is no answer [to the demand

requirement] to say that demand is necessarily futile . . . because the directors 'would have to sue

themselves"); Prudential, 659 A.2d at 970 ("A plaintiff may not bootstrap allegations of futility

merely by alleging that the directors participated in the challenged transaction or that they would

be reluctant to sue themselves.").

Plaintiffs argue that there is a substantial likelihood of liability on their breach of

fiduciary duties claims.  (Pl. Br. 16.)  The basic thrust of Plaintiffs' allegations is that the Board

was aware of serious cardiovascular health risks and nevertheless directed Merck to engage in

aggressive marketing of Vioxx and to publicly downplay or deny the existence of such risks.

Plaintiffs contend that by continuing to market Vioxx despite its potential health risks,

Defendants acted in bad faith and exposed Merck to billions of dollars in damages and losses.

(Pl. Br. 23.)

In Grill v. Stafford, a New Jersey Superior Court[4] applied Delaware law to reject

allegations of demand futility that were very similar to those made by Plaintiffs here.  No. MRS-

C-82-99, *affirmed by* Grill v. Stafford, No. A-0759-01T5 (N.J. Sup. Ct. App. Div. Jan. 8, 2003).

In Grill, shareholders brought a derivative action on behalf of American Home Products

("AHP"), against certain AHP officers and directors in connection with AHP's marketing and

sale of two prescription diet drugs, dexfenfluramine or "Redux" and fenfluramine or "Pondimin".

The Grill plaintiffs alleged that defendants breached their fiduciary duties by failing to disclose

---

[4]An unpublished New Jersey State Court opinion is not binding on this Court.  However,
the Court may rely on such a decision not for its precedential value, but for the strength of its
reasoning.  See National Surety Corp. v. Midland Bank, 551 F.2d 21, 30-31 (3d Cir. 1977)
(holding that while state court dicta is not binding it may be considered with regard to the
persuasiveness of its reasoning).

potential health risks and by selling and marketing the drugs despite possessing allegedly undisclosed information.  Plaintiffs argued to the Superior Court that demand was futile because: (1) certain directors "participated in, acquiesced in and approved" the wrongful conduct; (2) certain directors sold AHP stock during the relevant period; (3) the board faced a threat of personal liability and would be unwilling to sue themselves or their allies; (4) the company's insurance policies barred coverage of actions brought directly by AHP against the directors; (5) the directors received benefits from business arrangements with AHP, including annual retainers and service fees; and (6) there were business arrangements between and among the directors and the company.  Grill, No. MRS-C-82-99, at 6-12 (N.J. Super. Ct.).

The Superior Court of New Jersey dismissed the Grill complaint on the grounds that each of the "boilerplate reasons as to why [plaintiffs] should be excused from making a pre-suit demand on AHP's Board" was inadequate.  Id. at 6.  In part, the court ruled that mere allegations of participation in, approval of or acquiescence in the alleged bad acts were insufficient to excuse demand, that stock sales by two members of the twelve-member board of directors failed to establish that a majority of the directors were disinterested, and that allegations of directors threat of personal liability did not undermine the directors' independence.  Id. at 6-12.  The Appellate Division affirmed on the same grounds.  Grill, No. A-0759-01T5, at 17.

Like the claims set forth in Grill, the conclusory allegations before this Court are insufficient to demonstrate that Defendants' participation in the alleged wrongdoing creates a risk of substantial personal liability that excuses demand.  Plaintiffs' allegations are strikingly similar to those rejected in Grill.  Specifically, Plaintiffs allege that:

(d)     Defendants Bossidy, Bowen, Cole, Daley, Gilmartin, Harrison, Kelley,

> Miller, Shenk, Tatlock, Their, Weeks and Wendell, or a majority of them, authorized, approved, or consciously failed to prevent in breach of their duty of good faith the Vioxx marketing strategy employed by Merck, and the false statements arising therefrom, despite the growing body of scientific data showing the cardiovascular risks of Vioxx use, and therefore, are neither indpendent nor disinterested in the outcome of this litigation.
>
> (e)   Defendants Bossidy, Bowen, Cole, Daley, Gilmartin, Harrison, Kelley, Miller, Shenk, Tatlock, Their, Weeks and Wendell, or a majority of them, approved, continued to approve and monitor strategic marketing plans and funding authorizations designed to promote Vioxx to the widest possible market, all while receiving an ever-mounting body of scientific evidence which questioned the cardiovascular risk safety profile of Vioxx. . . . Moreover, their conscious, intentional or reckless conduct complained of herein was not undertaken in good faith and was not the product of a valid exercise of business judgment.

(Compl. ¶ 218 (d)-(e).)  Such conclusory allegations that the March 2004 Directors may have possessed information regarding potential health risks does not alone establish that any of those directors, let alone a majority of them, would have been incapable of objectively responding to pre-suit demand.  Despite Plaintiffs' conclusory assertions that the March 2004 Directors "played a strategic role in the events leading up to the Vioxx debacle" and were "inextricably linked" to the development and review of Merck's plan for Vioxx, Plaintiffs fail to allege facts establishing that any of the outside directors were involved in the research, development, manufacturing or sale of Vioxx.  (Compl. ¶¶ 186-88.)  Instead, Plaintiffs make undifferentiated allegations that the March 2004 Directors "approved," "participated in," or "caused" Merck to make strategic decisions regarding the marketing of Vioxx without specifying how, or in what way, Defendants participated.  Again, such patently conclusory allegations do not meet the pleading requirement of Rule 23.1.

Moreover,  Plaintiffs' allegations of knowledge on the part of the March 2004 Board are

likewise insufficient.   Plaintiffs contend that the results of the VIGOR study were published in

the *New England Journal of Medicine* and thereafter "Merck executives" met with the FDA to

discuss the results.  (Compl. ¶¶ 18-19.)  Subsequently, Plaintiffs contend, "defendants caused"

Merck to issue a misleading press release.  (Id. ¶ 20.)  Plaintiffs' allegations are similar with

regard to a study published in the JAMA and a study conducted by Harvard researchers.  (Id. ¶¶

21, 23.)   Plaintiffs do not plead with particularity any knowledge or action by the Board

generally, or by the March 2004 Board specifically.  The only allegation specific to the March

2004 Board is a letter sent by the FDA to Gilmartin in 2001 stating that the promotional

campaign minimizes risks observed in the VIGOR study.   However, Plaintiffs make no specific

allegation that he shared the letter with any other members of the March 2004 Board.  In short,

the Complaint "does not single out, among current or past directors, which directors participated

in the alleged wrongdoing . . . [n]o individual directors or group of directors are set apart; in fact,

many allegations do not differentiate among the directors and the other defendants."  Prudential,

282 N.J. Super. at 277.

Plaintiffs' allegations of knowledge and participation on the part of the March 2004

Board do not create an inference that these directors face a substantial likelihood of liability.

Excusing demand on this basis requires Plaintiff to set forth particularized allegations sufficient

to overcome the strong presumption that directors act in good faith, on an informed basis, and in

the belief that they are serving the best interests of the corporation.  Aronson, 473 A.2d at 815.

Again, a threat of personal liability alone "is insufficient to challenge either the independence or

disinterestedness of directors."   Id.  A substantial likelihood of liability can be shown "in rare

cases" when a transaction is "so egregious on its face that board approval cannot meet the test of

business judgment." Id.  Plaintiffs' conclusory allegations do not make the requisite showing of "egregious" behavior[5].

Plaintiffs' ability to demonstrate a directorial interest based upon a substantial likelihood of personal liability is also undermined by the exculpatory provision contained in Merck's corporate charter[6].  See Guttman, 823 A.2d at 501 ("[T]he threat of liability that directors face

---

[5]Plaintiffs contend that the Directors alleged disregard of known risks associated with the use of Vioxx constitutes egregious conduct and actions in bad faith.  (Pl. Br. 15.)  To support their proposition Plaintiffs rely on In re Tower Air, 416 F.3d 229 (3d Cir. 2005).  The Court finds Plaintiffs reliance on Tower Air unpersuasive.  First, the safety concerns in Tower Air were brought to the attention of the officers controlling the company's management and operations. Ignoring safety risks can be more easily characterized as "egregious" where the information lies in the hand of those officers involved in actually running the corporation on a day to day basis, as opposed to a group of predominantly outside directors with little involvement in the operations of the corporation.

Second, there is a significant difference between the safety warnings given to the officers in Tower Air, and those allegedly before Merck's Board.  The safety information provided to the officers in Tower Air revealed documented problems with aircraft maintenance and repair work. These reports were unquestionably negative and illustrated serious risks to public safety.  Here, Plaintiffs' own allegations assert that Defendants approved and monitored Merck's marketing and sales plans despite receiving a "body of scientific evidence which *questioned* the cardiovascular risk safety of Vioxx."  (Compl. ¶ 218(e))(emphasis added).  Plaintiffs have, therefore, failed to allege particularized facts that would suggest that the Directors' conduct was "egregious," or in bad faith.

[6]Generally, when considering a motion to dismiss pursuant to Rule 12(b)(6), the Court cannot consider materials outside the pleadings.  The Third Circuit, however, has held that certain "narrowly defined types of materials" can be considered without converting the motion to dismiss.  In re Rockefeller Ctr. Props. Sec. Litig., 184 F.3d 280, 287 (3d Cir. 1999); see Pryor v. Nat'l Collegiate Athletic Ass'n. 288 F.3d 548, 559-60 (3d Cir. 2002).  A court may consider a document explicitly relied upon in the complaint, or an "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  Rockefeller, 184 F.3d at 287 (quoting PBGC v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993)).  In Rockefeller, the Third Circuit explained the rationale for these exceptions by stating that the problem created by considering materials outside the complaint, "lack of notice to the plaintiff– is dissipated 'where plaintiff has actual notice . . . and has relied upon these documents in framing the complaint.'" Id.  (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410 (3d Cir. 1997)).

Accordingly, Merck's corporate charter is properly before the Court because Plaintiffs

can be influenced in a substantial way if the corporate charter contains an exculpatory charter

provision");  Kanter v. Barella, 388 F. Supp. 2d 474, 479 n.9 (D.N.J. 2005) ("Plaintiff's efforts to

demonstrate a substantial likelihood of liability is also stifled by the exculpation provision

contained in MedQuist's Certificate of Incorporation.").  Where, as here, directors are exempted

from liability, "the risk of liability does not disable them from considering a demand fairly unless

particularized pleading permits the court to conclude that there is a substantial likelihood that

their conduct falls outside the exemption."   In re Baxter Int'l, Inc. Shareholder Litig., 654 A.2d

1268, 1270 (Del. Ch. 1995).

        The exculpatory provision contained in Merck's corporate charter states that directors

and officers "shall not be personally liable to the Corporation or its stockholders for damages for

breach of any duty owed to the Corporation or its stockholders. . . ."  (Greenwald Decl. Ex. 7.)

The provision does not excuse liability on the part of an officer or director when the act or

_____

explicitly reference the provision in their demand futility allegations stating that, "[t]he acts
complained of . . . are not protected by the so-called 'raincoat provision' contained in Merck's
by-laws."  (Compl. ¶ 218(f).)  Elaborating on their claim, Plaintiffs again refer to and quote from
the exculpatory provision in their opposition brief, citing to Merck's corporate charter.  (Pl. Br.
25-26.)  Similarly, Merck's corporate charter was incorporated in the 10-Q from 2000 to which
the Complaint explicitly refers.  (Compl. ¶ 79.)
        Additionally, this Court can take judicial notice of Merck's corporate charter.  See In re
Baxter Int'l, Inc. Shareholder Litig., 654 A.2d 1268, 1269 (Del. Ch. 1995) ("[t]he court may take
judicial notice of the certificate [of incorporation] in deciding a motion to dismiss"); In Re
Wheelabrator Tech., Inc. Shareholders Litig., 1992 WL 212595, at *11 (Del. Ch. 1992) (same).
Rule 201(b) of the Federal Rules of Evidence states that a court may take judicial notice of any
fact not subject to reasonable dispute "that is either (1) generally known within the territorial
jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to
sources whose accuracy cannot reasonably be questioned."  F.R.E. 201(b).  The corporate
charter of a New Jersey corporation falls within the ambit of this rule.  By law, Merck's corporate
charter must be filed with the office of the Secretary of State of New Jersey.  N.J.S.A. 14A:2-6.
That office is within the territorial jurisdiction of this Court and is a source "whose accuracy
cannot reasonably be questioned."  The Court, therefore, takes judicial notice of Merck's
corporate charter.

omission (1) constitutes a breach of loyalty, (2) is committed in bad faith, or (3) results in an improper personal benefit.  (Id.)   As stated above,  Plaintiffs have failed to allege particularized facts which would suggest the alleged acts or omissions of the Directors were "egregious," or committed in bad faith.

      **b.**      **Director Independence**

      *1.*      *Directors' Personal and Professional Relationships*

Plaintiffs allege that demand should be excused because members of Merck's Board of Directors, as comprised on March 15, 2004, "have extensive disabling business, personal and philanthropic conflicts and ties with each other and Merck's top officers who presided over Merck's . . . Vioxx marketing strategy."  (Compl. ¶ 205.)  Directorial independence means that a director's decision "is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."  Rales, 634 A.2d at 936; Kanter, 388 F. Supp. 2d at 482.

Plaintiffs contend that Defendants Bown, Bossidy, Cole, Harrison, Miller, Kelly, Shenk, Thier and/or Wendell have "long-standing business relationships with Gilmartin."  (Id.)  To support their contention, Plaintiffs point to several particular business relationships: (1) Defendants Gilmartin and Miller sit on the board of directors of General Mills, where Defendant Atwater was also a director from 1981-1995; (2) Defendant Gilmartin is a director of the United Negro College Fund ("UNCF"), where Defendant Cole serves as an officer; (3) the UNCF awards biomedical fellowships to approved Merck/UNCF schools which are affiliated with seven of the thirteen directors; and (4) Defendants Gilmartin, Bossidy and Harrison are all members of The Business Council.

Plaintiffs take great effort outlining overlapping professional and personal memberships between the Directors.  Most of the relationships are similar to those discussed above: Defendants sitting on similar boards or being members of the same charitable organizations. Rather than recount each allegation, the Court will discuss a relevant sampling.   Plaintiffs point to the fact that Defendant Bossidy sits on the board of directors of JP Morgan Chase where Defendant Harrison has been the CEO since 2001.  JP Morgan Chase served as co-lead underwriter for Merck's $1.7 billion debt offering in 1997, and $2.4 billion debt offering in November 2001.  (Compl. ¶ 206.)

Defendant Bowen is the president of the Andrew W. Mellon Foundation, where Defendant Tatlock serves as a trustee.  (Id. ¶ 207.)  The Mellon Foundation awards grants to universities affiliated with eight members of the Board.  (Id.)   For example, Defendant Cole is President of Bennett College for Women which received $300,000 from the Mellon Foundation in 2003.  (Id. ¶ 208.)  Likewise, Defendant Thier is a trustee of Cornell University which received $375,000 in 2003 and $669,000 in June 2004 from the Mellon Foundation. (Id. ¶ 211.)

At the outset it must be noted that directors are "entitled to a *presumption* that they were faithful to their fiduciary duties."  Beam v. Stewart, 845 A.2d 1040, 1048 (Del. 2004) (emphasis in original).  It is the burden of the plaintiff in a derivative action to overcome that presumption. Id. A director will be considered interested and biased when he or she has a personal stake in the outcome of the outcome of the litigation or is otherwise not independent.  See Beam, 845 A.2d at 1049.  "A director's interest may be shown by demonstrating a potential personal benefit or detriment to the director as a result of the decision."  Id.   Similarly, to show lack of independence, a stockholder-plaintiff must demonstrate a reasonable doubt that a director is not

so beholden to an interested director "that his or her discretion would be sterilized." Id. at 1050.

Where a plaintiff alleges that a director is not sufficiently disinterested or independent and bases those allegations on the existence of personal relationships, those relationships "must be of a bias-producing nature." Beam, 845 A.2d at 1050. Courts will not excuse demand where it is alleged that the "defendants are self-interested because they do not want to sue themselves, their friends and their business associates." Prudential, 282 N.J. Super. at 278. Further, "[a]llegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a directors's independence." Beam, 845 A.2d at 1050 (citing Litt v. Wycoff, C.A. 19083-NC, 2003 WL 1794724, at *4 (Del. Ch. Mar. 28, 2003)).

Here, the Complaint does not address how the relationships between Merck's directors affect any board members ability to act independently with respect to the issues raised in this lawsuit. The allegations largely revolve around similar and shared associations between the directors in outside organizations. For example, although the Complaint highlights that Defendant Bossidy sits on the board of both Merck and JP Morgan Chase, where Defendant Harrison has been CEO since 2001, Plaintiffs do not explain why or how those relationships demonstrate that both individuals cannot act disinterestedly. See e.g., Kaplan v. Wyatt, 484 A.2d at 512-13 (finding that director of corporation was independent regardless of fact that he also was director of corporation's business partner and business dealing between two companies were at issue in derivative action). Allegations that Gilmartin and other directors served on other board of directors together, were members of business organizations, or are affiliated with the UNCF are insufficient, without more, to rebut the presumption of director independence.

Equally unavailing is Plaintiffs' contention that Defendants Bowen and Tatlock are involved in the Mellon Foundation, an organization which has given contributions to universities that are affiliated with other Defendant directors.  As noted, conclusory allegations of business or social relationships among directors cannot support a finding that the directors are incapable of exercising independent business judgment or acting disinterestedly.   The Complaint alleges that eight members of the Board represent seven universities which received grants from either the Mellon Foundation or the UNFC.  The Court perceives no nexus between the relationship of outside philanthropic foundations providing money to educational institutions, and the affiliated directors ability to exercise independent judgment.  Absent such a nexus, the Complaint fails to allege particularized facts establishing a reasonable doubt that a majority of directors' business and personal relationships bar them from acting disinterestedly.

Plaintiffs' allegations, viewed separately or as a whole, do not create a reasonable doubt that a majority of the board was not disinterested or independent.   The Complaint does not contained particularized facts, as required by Rule 23.1, demonstrating that at the time this Complaint was filed, Merck's Board could not have exercised independent business judgment to consider Plaintiffs' demand.   Therefore, Defendants' Motion to Dismiss will be granted and Plaintiffs must make a pre-suit demand on Merck's Board.

**D.      Leave to Amend**

In opposition to Defendants' Motion, Plaintiffs alternatively request leave to amend their Complaint.  (Pl. Br. 30.)  At the Court's request, both sides submitted supplemental briefing on this issue.  Defendants oppose Plaintiffs request, arguing (1) that Plaintiffs may not use information obtained in discovery to supplement their demand futility allegations, and (2) that

further amendment would be futile.  (Def. Supp. Br. 1-2.)

Rule 15(a) of the Federal Rules of Civil Procedure provides, "a party may amend its

pleadings only by leave of court or written consent of the adverse party; and leave shall be freely

given when justice so requires." FED.R.CIV.P. 15(a).  The decision to grant leave to amend rests

within the sound discretion of the trial court.  Zenith Radio Corp. v. Hazeltine Research Inc., 401

U.S. 321, 330 (1970).   In the absence of undue delay, bad faith or dilatory motive on the part of

the movant, leave to amend should be freely given.  Foman v. Davis, 371 U.S. 178, 182 (1962).

The burden to demonstrate good cause to amend is on the movant.  Leased Optical Departments-

Montgomery Ward, Inc. v. Opti-Center, Inc., 120 F.R.D. 476, 478 (D.N.J. 1988).

Plaintiffs have not submitted a proposed amended complaint for scrutiny.  However,

based upon the representations of counsel at oral argument[7], it would appear that amendments to

the Complaint would incorporate information obtained in discovery, stricken from use in the

instant Motion to Dismiss, to supplement and particularize Plaintiffs' existing allegations.  (Tr.

43:1-7; 66:20- 67:3.)   Likewise, Plaintiffs' unredacted brief effectively constituted their

demonstration of the additional factual specificity they were prepared to prove to cure their

patently conclusory pleadings of demand futility.  Considering those factual allegations, the

---

[7]    Plaintiffs' counsel stated at oral argument:

> MR. DOWNS:    Just to make the record correct, your Honor, we are
> in a position to amend so that everything in our chart that we weren't
> able to use today because much of this was barred by the other motion
> on the motion to strike, this indicates what the board knew at the time
> they knew about VIGOR, their responses . . . . We can plead those in
> detail –

(Tr 66:20-67:3.)

Court concludes that amendment would be futile because Plaintiffs may not rely on after-acquired information to bolster their allegations of demand futility.

It is well settled that, under Rule 23.1,  plaintiffs claiming demand futility must plead specific facts to support their claims and must do so without the aid of discovery.  See e.g., In re Kauffman Mut. Fund Actions, 479 F.2d 257, 263 (1st Cir. 1973); Tabas v. Mullane, 608 F. Supp. 759, 771 (D.N.J. 1985); PSE&G, 173 N.J. at 287; Beam v. Stewart, 845 A.2d 1040, 1056 (Del. 2004); Rales, 634 A.2d at 934; Grimes v. Donald, 673 A.2d 1207, 1216 n.11 (Del. 1996).   The Rales court stated that "[a]lthough derivative plaintiffs may believe it is difficult to meet the particularization requirement of Aronson because they are not entitled to discovery to assist their compliance with Rule 23.1, they have many avenues available to obtain information bearing on the subject of their claims."  634 A.2d at 935 n.10.

The demand requirement serves two primary functions.   First, it relieves courts from deciding matters of internal corporate governance by providing corporate directors with the first opportunity to correct alleged abuses.   Second, pre-suit demand provides a corporate board with reasonable protection from harassment by litigation, or strike suits, on matters clearly within the discretion of the directors.  See PSE&G, 173 N.J. at 278.   The pre-suit demand requirement is more than a procedural formality; it is a "rule of substantive right designed to give a corporation the opportunity to rectify an alleged wrong without litigation, and to control any litigation which does arise."  Aronson, 473 A.2d at 209.

When a plaintiff fails to make a pre-suit demand upon the board they must be aware, at the time of filing the complaint, of particularized facts which lead them to believe demand would be futile.  See Cramer v. General Tel. & Elec. Corp., 582 F.2d 259, 276 (3d Cir. 1978) ("[t]he

futility of making the demand required by Rule 23.1 must be gauged at the time the derivative action is commenced, not afterward with the benefit of hindsight").   The demand requirement would be rendered meaningless if a plaintiff who cannot establish demand futility when he files suit is nonetheless permitted to amend his pleading using materials later obtained during discovery to justify his failure to make a pre-suit demand.   As the <u>Kauffman</u> court stated:

> [T]he stockholder may not plead in general terms, hoping that, by discovery or otherwise, he can later establish a case.  Indeed, if the [pleading] requirement [of Rule 23.1] could be met otherwise, it would be meaningless.

479 F.2d at 263.

Here, amendment to Plaintiffs' Complaint would be futile.  Plaintiffs cannot bolster their Complaint by asserting after-acquired factual allegations.  Plaintiffs' request for leave to amend contains no suggestion that they would be able to satisfy the demand futility requirement without relying on information obtained during discovery, after the filing of their Complaint.  Moreover, Plaintiffs have made no indication that they could give further precision to the current allegations contained in their Complaint in such a manner as would satisfy the demand futility requirement without incorporating after-acquired materials.  Accordingly, amendment in these circumstances would be futile and, therefore, this Court will deny Plaintiffs' request for leave to amend their Complaint.

### III.   CONCLUSION

Plaintiffs have failed to make demand on Merck's Board pursuant to Rule 23.1 and the requirements of New Jersey law of corporate governance.  As explained above, Plaintiffs' allegations of demand futility are not pled with the particularity required by Rule 23.1.

Accordingly, this Court will **GRANT** Defendants' Motion to Dismiss Plaintiffs' Complaint.  An appropriate order will follow.

    s/ Stanley R. Chesler
Stanley R. Chesler, U.S.D.J.

34